**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO: _____**

**ALL WEB LEADS, INC.,**
**a Delaware corporation,**

      **Plaintiff,**

**v.**

**ANTHONY D'AMICO, an individual,**
**MICHELLE DENTON, an individual,**
**FUEL AVENUE, INC., a Florida Corporation,**
**BEST RATE HEALTHCARE, INC., a**
**Florida Corporation, GUSTAVO PENA, an**
**individual, MANUEL SILVA, an individual,**
**JESEL E. SILVA, an individual, MAEDIA**
**GENIX, CORP., a Florida Corporation,**
**FLOVALUE, CORP., a Florida Corporation,**
**and FLOWVAL, CORP., a Florida Corporation,**

      **Defendants.**

**_____/**

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

    1.    This is an action for injunctive relief and damages in excess of $75,000.00, exclusive of costs, interest and attorneys' fees.

## PARTIES AND JURISDICTION

    2.    Plaintiff, ALL WEB LEADS, INC. ("AWL" or "Plaintiff"), is a Delaware corporation which is headquartered in Austin, Texas.

    3.    Defendant, ANTHONY D'AMICO ("D'Amico"), is a resident of Boca Raton in the State of Florida, and is, in all respects, sui juris.

4.     Defendant MICHELLE DENTON ("Denton") is a resident of Boca Raton in the State of Florida, and is in all respects, sui juris.  Denton is the girlfriend and/or fiancée of D'Amico.

5.     Defendant, FUEL AVENUE, INC. ("Fuel Avenue"), is a Florida corporation which is owned and operated by D'Amico, its President, Secretary and Director.  Fuel Avenue's principal place of business is 6972 Palmetto Circle South, #517, Boca Raton, Florida 33433, the residential apartment of Denton.

6.     Defendant, BEST RATE HEALTHCARE, INC. ("Best Rate"), is a Florida corporation which is owned and operated by D'Amico, its President, Secretary and Director. Best Rate's principal place of business is 6972 Palmetto Circle South, #517, Boca Raton, Florida 33433, the residential apartment of Denton.

7.     Defendant, GUSTAVO PENA ("Pena"), is a resident of Sunny Isles Beach in the State of Florida, and is, in all respects, sui juris.

8.     Defendant, MANUEL SILVA ("M. Silva"), is a resident of Miramar in the State of Florida, and is, in all respects, sui juris.

9.     Defendant, JESEL E. SILVA ("J. Silva"), is a resident of Miramar in the State of Florida, and is, in all respects, sui juris.  J. Silva of a familial relation to M. Silva, given their shared address and name.

10.    Defendant Maedia Genix, Corp. ("MGC") is a Florida corporation, which is owned and operated by Defendant Pena and has a principal place of business in Weston, Florida.

11.    Defendant Flovalue Corp. ("Flovalue") is a Florida corporation which is owned and operated by Defendant Pena and has principal places of business in Aventura, Florida and Weston, Florida.   Flovalue is the registered agent of MGC.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

12.     Defendant Flowval, Corp. ("Flowval") is a dissolved Florida corporation which is owned and operated by Defendant Pena and M. Silva and has a principal place of business in Aventura, Florida.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the matter in controversy exceeds, exclusive of interest, costs and attorney's fees, the sum or value of seventy-five thousand dollars ($75,000.00).

14.     Venue is proper in Palm Beach County, Florida, because, as set forth in more detail below, AWL first suffered damage and injury as a result of Defendants' acts in this judicial district.

## FACTS

15.     At all times relevant to the claims at issue in this action, AWL was engaged in the business of providing lead generation services to customers around the country.

16.     At all relevant times to the claims at issue in this action, D'Amico was an employee, or immediate former employee of AWL.

17.     At all times relevant to the claims at issue in this action, Fuel Avenue was engaged in the business of providing lead generation services to customers around the country. Unbeknownst to AWL, Fuel Avenue was formed by D'Amico on or about July 3, 2017 with the Florida Division of Corporations.

18.     At all times relevant to the claims at issue in this action, Best Rate was engaged in related insurance services to customers around the country.   Best Rate was formed by D'Amico on or about October 13, 2017 with the Florida Division of Corporations.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

19.     At all times relevant to the claims at issue in this action, AWL, Fuel Avenue, Best Rate, MGC and non-party Exact Match Media, LLC ("Exact LLC") have engaged in similar and/or competitive businesses.

### General Background on Health Insurance Lead Generation Industry

20.     The United States healthcare industry is an aggregation and integration of sectors within the U.S. economy that provides goods and services to treat patients with curative, preventive, rehabilitative, and palliative care.   The U.S. healthcare industry is divided into many sectors and depends on interdisciplinary teams of trained professionals and paraprofessionals to meet health needs of individuals. Health insurance has been one way individuals have historically paid for their healthcare needs.   Since the enactment of the Affordable Care Act, the U.S. population was mandated to carry certain basic levels of health insurance, subject to some limited exceptions.   The Affordable Care Act increased the need for the U.S. Population to find health insurance coverage.

21.     AWL is in the business of lead generation, which means AWL finds individuals who are interested in a service (a "lead"), and they put those people in touch with the service provider.   Lead generation firms, like AWL, play a vital role in the insurance industry.   As a lead generator, AWL uses its unique skills and services to put potential insureds in contact with insurers.   One of those skills is generating leads in the form of consumer-initiated phone calls and matching those health insurance shoppers with healthcare agents and brokers who can provide an insurance quote and sell an insurance policy. For its efforts of introducing an insured to an insurer, AWL is paid a fee for the introduction.

22.     As a lead generator, AWL is especially concerned with the confidentiality of its customer information because if a competitor has knowledge regarding AWL's pricing and

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

customer information, it will facilitate the competitor's ability to compete with AWL.   Like others in the lead generation industry, AWL spends substantial time and money protecting its confidential, trade secret, and proprietary information and systems.   As a result, any threat of a breach of confidentiality is taken very seriously in the lead generation industry and by AWL.

## AWL's Relation to Denton

23.     On or about June 16, 2015, Exact LLC hired Denton as an at will employee to act as its Junior Account Executive in its Boca Raton/Fort Lauderdale offices.   On or about February 3, 2016, Denton was promoted to Account Executive, responsible for Sales effective February 1, 2016, reporting to Director of Sales, D'Amico.

24.     At time, Exact LLC was a smaller lead generator than AWL, but it was successful in the industry and within its territories.

25.     In consideration for Denton joining Exact LLC, Exact LLC and Denton entered into a June 12, 2015 Confidentiality, Non-Solicitation, Non-Competition, and Proprietary Rights Agreement (the "Denton Non-Compete").   A true and correct copy of the Denton Non-Compete is attached hereto as **Exhibit 1**.   On September 1, 2017, AWL acquired the assets of Exact LLC.   AWL incorporated those assets into its business by starting its Exact Match Media division ("EMM").

26.     The Denton Non-Compete was one of the assets acquired by AWL from Exact LLC.   Any obligation from Denton to Exact LLC is an obligation from Denton to AWL, as Exact LLC's successor in interest to the Denton Non-Compete.

27.     As Sales Account Executive, and pursuant to § 1 of the Denton Non-Compete, Denton was given access to Exact LLC's highly confidential information that is considered a trade secret, proprietary or business sensitive information including, but not limited to, information

5

related to Exact LLC's actual or anticipated business, research and development, technical data, trade secrets or know-how, including but not limited to research, product plans, customer lists and customers, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information (hereinafter, collectively the "Denton-Related Confidential Information"). The Confidential Information also includes information such as client budgets and management thereof, processes/methods for managing accounts and when to use such processes/methods, technology specific aspects of managing client accounts, processes and insights. Denton specifically had access to the Invoca® platform used by EMM to route leads, the knowledge of how to use the platform to direct call volume to a customer, including set up a customer in the platform, configuration of the DID phone number routing, how to monitor volume of calls distributed to customers as leads, and the specifications, by customer, that ensure proper lead routing to their accounts. She also had the customer-knowledge of their appetite for volume and specification of calls they want to receive.

28.    The Denton Non-Compete contained restrictive covenants that were necessary to protect the legitimate business interests of Exact LLC (and its successors) and its assets, since Denton had access to the Confidential Information.

29.    Pursuant to § 2(a) Denton Non-Compete, all work product created by Denton be during the time of her employment belonged to Exact LLC (and its successors).

30.    Pursuant to § 4 of the Denton Non-Compete, Denton agreed that during the term of her employment, she would not engage in any other employment, occupation, or consulting related to Exact LLC's business in which Exact LLC was then involved or became involved; moreover,

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

Denton agreed she would not engage in any activities that conflicted with her obligations to Exact LLC.

31.     Pursuant to § 3 the Denton Non-Compete, Denton agreed that during her employment and for twelve (12) months following termination of her employment with Exact LLC, she would not directly or indirectly interfere with Exact LLC's customer relationships.

32.     Pursuant to § 4 of the Denton Non-Compete, Denton agreed that during her employment and for twelve (12) months after termination of her relationship with Exact LLC, that she would not compete against Exact LLC, directly or indirectly, within fifty (50) miles of her designated territory or within fifty (50) miles Exact LLC's office locations.

33.     The restrictive covenants contained in Sections 1, 2, 3, & 4 of the Denton Non-Compete (hereinafter, the "Denton Restrictive Covenants"), were designed to protect one or more of Exact LLC's legitimate business interests, including (i) protection of the Denton-Related Confidential Information that is a trade secret, as set forth above; (ii) protection of the Denton-Related Confidential Information that is not a trade secret; (iii) protection of Exact LLC 's substantial relationships with existing and prospective customers; and (iv) protection of goodwill associated with the "EMM" business name and trademark.

34.     The Denton Restrictive Covenants inure to the benefit of AWL as successor in interest to Exact LLC in the Denton Non-Compete.

35.     Denton was terminated by Exact LLC on or about April 14, 2017.

### AWL's Relation to D'Amico

36.     On or about September 1, 2017, AWL hired Defendant D'Amico as an at will employee to be its Director of Sales & Marketing at its Exact Match Media Division at AWL's satellite office in Boca Raton, Florida.   In consideration for D'Amico joining AWL, D'Amico

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

entered into a September 1, 2017 non-competition, non-solicitation, trade secret, and proprietary information provisions of an Employee Proprietary Information Agreement he executed with AWL (the "EPIA"), a true and correct copy of with is attached hereto as **Exhibit 2**.

37.     As a Director of Sales and Marketing in  Fort Lauderdale, and pursuant to § 2 of the EPIA, D'Amico was given access to AWL's highly confidential information that is considered a trade secret, including, but not limited to, information related to AWL's actual or anticipated business, research and development, technical data, trade secrets or know-how, including but not limited to research, product plans, customer lists  and customers, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information (hereinafter, collectively the "D'Amico Related Confidential Information").   The D'Amico Related Confidential Information also includes information such as client budgets and management thereof, processes/methods for managing accounts and when to use such processes/methods, technology specific aspects of managing client accounts, processes and insights.  D'Amico specifically had access to the Invoca® platform used by EMM to route leads and calls, the knowledge of how to use the platform to direct lead/call volume to a customer, including set up a customer in the platform, configuration of the DID phone number routing, how to monitor volume of calls distributed to customers as leads, and the specifications, by customer, that ensure proper lead routing to their accounts.   He also had the customer-knowledge of their appetite for volume and specification of their call lead demand as well as the contact information, pricing, contractual terms, schedules, and demand picture for all customers who have purchased historically from EMM during his tenure.   Mr. D'Amico had access in the contract maintenance software to

contracts, terms, and pricing previously signed by EMM that were stored electronically, including those customers he did not manage or purchased prior to his employment.

38.     The EPIA contained restrictive covenants that were necessary to protect the legitimate business interests of AWL since D'Amico had access to the D'Amico-Related Confidential Information.

39.     Pursuant to § 3(b) EPIA, all work product created by D'Amico be during the time of his employment belonged to AWL.

40.     Pursuant to § 4 of the EPIA, D'Amico agreed that during the term of his employment, he would not engage in any other employment, occupation, or consulting related to AWL's business in which AWL was then involved or became involved; moreover, D'Amico agreed he would not engage in any activities that conflicted with his obligations to AWL.

41.     Pursuant to § 6 the EPIA, D'Amico agreed that during his employment and for one (1) year following termination of his employment with AWL, he would not directly or indirectly interfere with AWL's customer relationships.

42.     Pursuant to § 7 of the EPIA, D'Amico agreed that during his employment and for twelve (12) months after termination of his relationship with AWL, that he would not compete against AWL, directly or indirectly, within his designated territory of the counties within the State of Texas and the State of Florida, or any other locations in the world where AWL has non-trivial operations, facilities, or customers prior to his date of termination.

43.     The restrictive covenants contained in Sections 2, 3, 4, 6, & 7 of the EPIA (hereinafter, the "D'Amico Restrictive Covenants"), were designed to protect one or more of AWL's legitimate business interests, including (i) protection of the D'Amico-Related Confidential Information that is a trade secret, as set forth above; (ii) protection of the D'Amico-Related

Confidential Information that is not a trade secret; (iii) protection of AWL's substantial relationships with existing and prospective customers; and (iv) protection of goodwill associated with the "AWL" business name.

44.     As the Director of Sales and Marketing, D'Amico had access to AWL's Invoca® Platform.

45.     AWL considers the Denton-Related Confidential Information and the D'Amico-Related Confidential Information identical in nature and almost identical in content. Consequently, AWL collectively refers to them as the "Confidential Information."

46.     At issue in this case are leads interested in buying health insurance, the electronically routing of those leads via circuits and wires to customers who sell health insurance. Much of the known damages addressed by this Complaint occurred during a brief period of time, which happened to be the time of year for open enrollment for health insurance under the Affordable Care Act.   This brief period in recent years is when the highest volume of people are searching for health insurance.

47.     On January 8, 2018, AWL identified that D'Amico as possibly involved in a scheme to defraud the Company of $3 million in accounts receivables that should have been paid to AWL.  Subsequently, AWL has spent many weeks uncovering the details of a complex and sophisticated plan to reroute leads in a way that would divert payment for those leads to Fuel Avenue for the benefit of D'Amico, and quite possibly for the benefit of Best Rate and Denton.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

**The Connection Between AWL and Exact Match Media, LLC**

48.     On September 1, 2017, AWL acquired the assets of Exact LLC, a smaller lead generation business located in Boca Raton, Florida.  AWL incorporated those assets into its business by starting its Exact Match Media division ("EMM").

49.     Among the assets purchased by AWL purchased from Exact LLC was the June 15, 2015 Denton Non-Compete and an April 28, 2017 separation agreement (the "Denton SA") that Exact LLC executed with Denton.  All obligations owed by Denton to Exact LLC under the Denton Non-Compete and Denton SA were sold to AWL and are obligations Denton owes to AWL.

50.     EMM purchases calls from consumers interested in buying health insurance, and then resells those calls to EMM's health insurance customers.

51.     Prior to joining AWL on September 1, 2017 at AWL's Boca Raton office, Mr. D'Amico had been and employee of Exact, LLC.

52.     As Director of Sales & Marketing, D'Amico was responsible for assisting in the collections of accounts receivable from the customers he generated.  EMM had its own accounting group for the customers developed by that division.  Three of the EMM division customers were Health Insurance Innovations ("HII"), Ehealth Insurance Services ("Ehealth"), and Vela Point.  Prior to the establishment of the EMM division, HII and Vela Point had been reliable at paying their bills to Exact Match Media, LLC.  It was later discovered that Ehealth was a fictitious customer contract crafted by D'Amico utilizing his Docusign login credentials.   In my opinion, D'Amico did this to conceal his embezzlement of AWL's product.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

53.     As the calendar progressed into November and December of 2017, AWL began to notice that these typically reliably, timely payers of receivables were not paying their balances and that Ehealth did not meet their payment obligation timely.

54.     D'Amico reassured AWL Accounting and his manager, Jeremy Attick, Vice President of AWL Sales, in a series of phone calls and emails over the course of two months that the customers planned to pay the invoices, citing the holidays and other issues for the delay in payment.  From what AWL can tell at this time, D'Amico made no collections efforts on behalf of EMM to collect the outstanding accounts receivable in question.

55.     After several months of attempting to work through Mr. D'Amico and EMM Accounting to collect the amounts owed by these customers, AWL Accounting determined that the billing information and email addresses provided by Mr. D'Amico to EMM Accounting for the customers to receive the invoices were invalid.   Moreover, upon AWL Accounting contacting the customers, no actual employee at HII, Ehealth, or Vela Point had ever received an invoice.

56.     Thereafter, AWL Accounting directed EMM Accounting to utilize previously known email addresses provided by AWL Accounting for Ehealth and resubmit the invoices.  Upon receipt of the unpaid invoices, the customer responded that they did not receive some or any lead product (i.e., calls) from EMM for the periods invoiced.  Subsequently, Jeremy Attick confirmed with Adam Wild of HII and Ean Vickrey of Vela Point that the invoiced amounts did not represent product they received.

57.     Through subsequent investigation, AWL determined Mr. D'Amico created Fuel Avenue, Inc. on or about July 3, 2017 and Best Rate on or about October 13, 2017.

58.     According to the records of the Florida Department of State, Division of Corporations, the principal address for both Fuel Avenue and Best Rate is 6972 Palmetto Circle

South, #517, Boca Raton, Florida 33433.   That address is the residential apartment for Michelle

Denton, the fiancée and/or girlfriend of D'Amico.

59.     Upon investigation, D'Amico was sending EMM-generated consumer calls

through the EMM Invoca® platform, purportedly to a mix of fictitious and real customer accounts

(HII, EHealth, and Vela Point).   In fact, D'Amico was redirecting the calls to other customers and

then invoicing those customers directly and receiving payment using his Fuel Avenue business

entity.

60.     Through auditing the Invoca® platform, listening to call recordings, and reviewing

phone numbers listed on owned domains, AWL identified the two largest recipients of the

redirected calls, Simple Health Insurance ("Simple Health") and National Brokers of America

("NBOA").

61.     NBOA confirmed payments totaling  $193,000, at $15 per call, were sent to Fuel

Avenue, Inc. for calls routed through specific DID#s  assigned by NBOA to Fuel Avenue,

Inc.. An audit in the Invoca® Platform confirmed through reviewing call recordings and

reviewing the DID phone numbers substituted in place of legitimate customer DID's that NBOA

received approximately 13,000 calls redirected by D'Amico from September 1, 2017 to January 8,

2018.

62.     Simple Health Insurance also confirmed they received the calls stolen by D'Amico

and paid MGC rather than AWL for its stolen product.   In total, over 80,000 calls were stolen

from AWL and sold to Simple Health as part of D'Amico's embezzlement scheme from

September 1, 2017 to January 8, 2018.

63.     AWL conducted an audit of the Invoca® platform, which confirmed that the Direct

Inbound Dial ("DID") phone numbers for the calls had been changed by D'Amico to phone

numbers that Simple Health had provided to another Florida entity, Defendant MGC to use when routing calls into its call center.   A representative of Fuel Avenue, Inc. obtained the DID's for Fuel Avenue from NBOA and D'Amico inserted the DID's into AWL's Invoca® Routing platform.   From AWL's investigation, it appears D'Amico also obtained the DID's for MGC (that were provided to them by Simple Health) and entered these into the Invoca® platform, using his login credentials for Invoca, to divert product away from legitimate paying customers. According to Invoca, D'Amico's user name and password were used to make these changes by entering the Invoca® Platform remotely in the early morning hours – usually between 1:00 and 3:00 a.m. – by utilizing his unique username and password provided to him exclusively for his legitimate work on behalf of AWL.   An Invoca® audit confirmed D'Amico's log in and access of the DID update screen in Invoca® at a sample of each of the key DID phone number updates made on two of the three accounts in question (HII and Ehealth).

64.     The listed registered agent and director of Defendant MGC is Defendant Flovalue, located at 1500 Weston Road, Suite 200, Weston, Florida 33326.   MGC's corporate filings with the Florida Secretary of State have been electronically signed by Defendant Pena.

65.     Defendant Flovalue lists Defendant Pena as its registered agent and sole director. Defendant Flovalue's principal address is 2903 Point East Drive, Apt. K-306.

66.     Defendant Pena also was associated with Defendant Flowval, dissolved as of September 22, 2017, which also has its principal address is 2903 Point East Drive, Apt. K-306. Defendant Pena was listed as Flowval's registered agent and a director, along with Defendant M. Silva.

67.     Defendant M. Silva appears to be of familial relation to Defendant J. Silva, who is a Senior Account Manager of Simple Insurance, and is responsible for maintaining day-to-day

relationships with marketing providers, and from AWL's interactions those include reconciling account activity and forwarding vendor invoices for purchased leads, like those made to MGC, for payment.

68.     Upon information from Simple Health and its counsel, Maedia Genix received "fair market value" for over 80,000 calls (as determined by Invoca®), which money should have been sent to AWL. The fair market value of those 80,000 calls is in excess of $1.122 million.

69.     AWL incurred approximately $2,000,000 in cost of goods sold to generate the call volume fraudulently redirected by Mr. D'Amico to customers that were all monetized by Mr. D'Amico for his own personal benefit, not AWL's.

70.     On January 8, 2018, D'Amico voluntarily resigned from his employment with AWL.

71.     AWL demanded that D'Amico return his work computer, which contained Confidential and trade secret information within its storage devices, and D'Amico has failed to return this computer.

72.     At the time D'Amico terminated from AWL, D'Amico deleted all data from his work phone before returning it.   D'Amico also deleted all of his old emails from his work email account prior to terminating from AWL.

73.     All conditions precedent to the filing of this action have occurred, have been waived, or have been performed.

74.     AWL has retained the undersigned counsel and is obligated to pay them a reasonable fee for their services.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

## COUNT I – INJUNCTION TO REMEDY BREACH OF EPIA
## (AGAINST ALL DEFENDANTS)

75.     AWL realleges paragraphs 1 through 74 above.

76.     This is a cause of action for injunction under the EPIA, the Denton Non-Compete, Florida Statute § 542.335 and Florida Statute § 688.003.

77.     D'Amico has breached the EPIA with AWL by, during his employment, utilizing the Confidential Information to the detriment of AWL.

78.     D'Amico has breached the EPIA with AWL by soliciting AWL's customers, on behalf of Fuel Avenue and Best Rate, and sharing the Confidential Information with Fuel Avenue and Best Rate.

79.     D'Amico has breached the EPIA with AWL by, utilizing the Confidential Information and trade secret information during his employment to the detriment of AWL and for the benefit of Fuel Avenue and Best Rate and himself.

80.     D'Amico has breached the EPIA with AWL by, utilizing the Confidential Information and trade secret information after his employment to the detriment of AWL and for the benefit of Fuel Avenue, Best Rate, Denton and himself.

81.     Denton has breached the Denton Non-Compete with AWL by, utilizing the Confidential Information and trade secret information after her employment to the detriment of AWL and for the benefit of Fuel Avenue, Best Rate, D'Amico and herself.

82.     D'Amico has breached the EPIA with AWL by, during his employment, competing against AWL through his companies Fuel Avenue and Best Rate.

83.     D'Amico has breached the EPIA with AWL by, after his employment, competing against AWL through his companies Fuel Avenue and Best Rate.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

84.     Denton has breached the Denton Non-Compete with AWL by, after her employment, competing against AWL through her companies Fuel Avenue and Best Rate.

85.     Denton has breached the Denton Non-Compete with AWL by soliciting D'Amico at a time he was employed by AWL to form and work at Fuel Avenue and Best Rate.

86.     As a result of D'Amico's breaches of the EPIA, he is in a position to improperly and unfairly utilize the Confidential Information, to continue to solicit or attempt to solicit current and prospective customers of AWL with whom AWL has or had substantial relationships and to unfairly compete against AWL in the highly competitive market of advertising and marketing.

87.     As a result of Denton's breaches of the Denton Non-Compete, she is in a position to improperly and unfairly utilize the Confidential Information, to continue to solicit or attempt to solicit current and prospective customers of AWL with whom AWL has or had substantial relationships and to unfairly compete against AWL in the highly competitive market of advertising and marketing.

88.     AWL has legitimate business interests that justify enforcement of the D'Amico Restrictive Covenants contained in the EPIA.   These interests include, but are not limited to: (i) protection of the Confidential Information that is a trade secret; (ii) protection of the Confidential Information that is not a trade secret; (iii) substantial relationships with existing and prospective customers; and (iv) protection of goodwill associated with the "AWL" business name.

89.     AWL has legitimate business interests that justify enforcement of the Denton Restrictive Covenants contained in the Denton Non-Compete.   These interests include, but are not limited to: (i) protection of the Confidential Information that is a trade secret; (ii) protection of the Confidential Information that is not a trade secret; (iii) substantial relationships with existing and prospective customers; and (iv) protection of goodwill associated with the "AWL" business name.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

90.     The D'Amico Restrictive Covenants contained in the EPIA, including the time restrictions, are reasonable and designed specifically to protect AWL's legitimate business interests.

91.     The Denton Restrictive Covenants contained in the Denton Non-Compete, including the time restrictions, are reasonable and designed specifically to protect AWL's legitimate business interests.

92.     AWL seeks to enjoin D'Amico's continued breach of the EPIA because AWL has no adequate remedy at law to remedy such breach.

93.     AWL seeks to enjoin Denton's continued breach of the Denton Non-Compete because AWL has no adequate remedy at law for such breach.

94.     AWL further seeks to enjoin Fuel Avenue's and Best Rate's interference with the EPIA and Denton Non-Compete through their continued association with D'Amico and Denton in conjunction with its aiding and abetting both D'Amico's breach of the EPIA and Denton's breach of the Denton Non-Compete.

95.     AWL has been and will continue to be irreparably harmed as a result of D'Amico's breaches of and Fuel Avenue's and Best Rate's interference with the EPIA.

96.     AWL has been and will continue to be irreparably harmed as a result of Denton's breaches of and Fuel Avenue's and Best Rate's interference with the Denton Non-Compete.

97.     The injuries which AWL has sustained and will continue to sustain outweigh any possible harm to D'Amico, Denton, Fuel Avenue, or Best Rate if enjoined.

98.     AWL has a substantial likelihood of prevailing on the merits because the EPIA and Denton Non-Compete are clearly enforceable and do not violate Florida law.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

99.     Enforcement of an injunction against D'Amico, Denton, Fuel Avenue and Best Rate will not be adverse to the public interest.

100.    Pursuant to § 11(b) of the EPIA and Section 542.335(1)(j), Fla. Stat., AWL is entitled to injunctive relief to restrain D'Amico and those persons acting in concert with him, including Denton, Fuel Avenue and Best Rate, from directly or indirectly violating the Restrictive Covenants contained in the Denton Non-Compete.

101.    Pursuant to § 6 of the Denton Non-Compete and Section 542.335(1)(j), Fla. Stat., AWL is entitled to injunctive relief to restrain Denton and those persons acting in concert with her, including D'Amico, Fuel Avenue and Best Rate, from directly or indirectly violating the Restrictive Covenants contained in the EPIA.

102.    Pursuant to § 6 of the Denton Non-Compete, Denton has waived AWL's need to post a bond or other security in the bringing of this action.

103.    Pursuant to § 11(b) of the EPIA, D'Amico has waived AWL's need to post a bond or other security in the bringing of this action.

WHEREFORE, AWL respectfully requests this Court enter an order enjoining and restraining D'Amico, directly or indirectly, individually, collectively or through or on behalf of Denton, Fuel Avenue and Best Rate, from soliciting with AWL's customers for one (1) years following D'Amico's January 8, 2018 termination of employment (plus an additional period for the time during which D'Amico has been in breach of the EPIA), enjoining and restraining Denton, directly or indirectly, individually, collectively or through or on behalf of D'Amico, Fuel Avenue and Best Rate, from soliciting with AWL's customers for one (1) years following Denton's April 28, 2017 termination of employment (plus an additional period for the time during which Denton has been in breach of the Denton Non-Compete), enjoining Fuel Avenue and Best

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

Rate from continuing to associate with or maintain D'Amico and/or Denton in their employ for purposes of soliciting AWL's clients during the period of this injunction, enjoining D'Amico, D'Amico, Fuel Avenue, and Best Rate from utilizing the Confidential Information, awarding AWL its attorneys' fees and costs incurred in bringing this action pursuant to Section 10 of the Denton Non-Compete, Section 542.335(1)(k), Fla. Stat., and Chapter 688.005, and granting such other relief as this Court deems just and proper.

<b>COUNT II – DAMAGES FOR BREACH OF EPIA<br>(AGAINST D'AMICO)</b>

104.    AWL realleges paragraphs 1 through 74 above.

105.    D'Amico and AWL have entered into the EPIA, which is a valid and enforceable contract.

106.    D'Amico has breached the EPIA with AWL by, among other things, soliciting AWL's customers on behalf of Fuel Avenue and Best Rate and utilizing the Confidential Information after his employment at AWL ceased.

107.    As a result of D'Amico's breaches of the EPIA, AWL has been damaged.

108.    AWL is also entitled to damages against D'Amico in an amount in excess of $3,000,000.

WHEREFORE, AWL demands judgment in its favor and against D'Amico for damages, plus costs, interest, attorneys' fees and such other relief as this Court deems just and proper.

<b>COUNT III – DAMAGES FOR BREACH OF EPIA<br>(AGAINST DENTON)</b>

109.    AWL realleges paragraphs 1 through 74 above.

110.    Denton and Exact LLC have entered into the Denton Non-Compete, which is a valid and enforceable contract.

20

111.    Pursuant to § 10 to the Denton Non-Compete, the Denton Non-Compete shall inure to the benefit of any successor, legal representative or assigns of Exact LLC.

112.    AWL is the success in interest in the Denton Non-Compete, which it purchased from Exact LLC.

113.    Denton has breached the Denton Non-Compete by, among other things, soliciting AWL's customers on behalf of Fuel Avenue and Best Rate, utilizing the Confidential Information after her employment at AWL ceased, creating and being employed by two lead generation companies, and operating competing lead generation entities out of her personal residence.

114.    As a result of Denton's breaches of the Denton Non-Compete, AWL has been damaged.

115.    AWL is also entitled to damages in an amount in excess of $3,000,000.00 as provided in § 6 of the Denton Non-Compete.

WHEREFORE, AWL demands judgment in its favor and against Denton for damages, plus costs, interest and attorney's fees pursuant to § 10 of the Denton Non-Compete, and such other relief as this Court deems just and proper.

## COUNT IV - TORTIOUS INTERFERENCE WITH EPIA
### (AGAINST DENTON, FUEL AVENUE AND BEST RATE)

116.    AWL realleges paragraphs 1 through 74 above.

117.    AWL has a contractual relationship with D'Amico, *i.e.*, the EPIA, under which AWL has legal rights.

118.    Fuel Avenue knows of the contractual relationship between AWL and D'Amico due to D'Amico's ownership status of Fuel Avenue and his management of Fuel Avenue.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

119.    Best Rate knows of the contractual relationship between AWL and D'Amico due to D'Amico's ownership status of Best Rate and his management of Best Rate.

120.    Denton knows of the contractual relationship between AWL and D'Amico due to Denton's personal and romantic relationship with D'Amico and the fact that they both worked at Exact, LLC, AWL's predecessor in interest.

121.    Fuel Avenue has intentionally and unjustifiably interfered and continues to interfere with the contractual relationship between AWL and D'Amico.

122.    Best Rate has intentionally and unjustifiably interfered and continues to interfere with the contractual relationship between AWL and D'Amico.

123.    Denton has intentionally and unjustifiably interfered and continues to interfere with the contractual relationship between AWL and D'Amico.

124.    As a direct and proximate result of Fuel Avenue's interference with AWL's contractual relationship with D'Amico, AWL has been and continues to be damaged.

125.    As a direct and proximate result of Best Rate's interference with AWL's contractual relationship with D'Amico, AWL has been and continues to be damaged.

126.    As a direct and proximate result of Denton's interference with AWL's contractual relationship with D'Amico, AWL has been and continues to be damaged.

127.    Denton, Fuel Avenue and Best Rate are jointly and severally liable to AWL for the damages they have caused.

WHEREFORE, AWL demands judgment in its favor and against Denton, Fuel Avenue and Best Rate, jointly and severally, for damages, plus costs, interest, and such other relief as this Court deems just and proper.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

**COUNT V - TORTIOUS INTERFERENCE WITH DENTON NON-COMPETE
(AGAINST D'AMICO, FUEL AVENUE AND BEST RATE)**

128.    AWL realleges paragraphs 1 through 74 above.

129.    AWL has a contractual relationship with Denton, *i.e.*, the Denton Non-Compete, under which AWL has legal rights.

130.    Fuel Avenue knows of the contractual relationship between AWL and Denton due to Denton's ownership status of Fuel Avenue and her management of Fuel Avenue.

131.    Best Rate knows of the contractual relationship between AWL and Denton due to Denton's ownership status of Best Rate and her management of Best Rate.

132.    D'Amico knows of the contractual relationship between AWL and Denton due to D'Amico's personal and romantic relationship with Denton and the fact that they both worked at Exact, LLC, AWL's predecessor in interest.

133.    Fuel Avenue has intentionally and unjustifiably interfered and continues to interfere with the contractual relationship between AWL and Denton.

134.    Best Rate has intentionally and unjustifiably interfered and continues to interfere with the contractual relationship between AWL and Denton.

135.    D'Amico has intentionally and unjustifiably interfered and continues to interfere with the contractual relationship between AWL and Denton.

136.    As a direct and proximate result of Fuel Avenue's interference with AWL's contractual relationship with Denton, AWL has been and continues to be damaged.

137.    As a direct and proximate result of Best Rate's interference with AWL's contractual relationship with Denton, AWL has been and continues to be damaged.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

138.    As a direct and proximate result of D'Amico's interference with AWL's contractual relationship with Denton, AWL has been and continues to be damaged.

139.    D'Amico, Fuel Avenue and Best Rate are jointly and severally liable to AWL for the damages they have caused.

WHEREFORE, AWL demands judgment in its favor and against D'Amico, Fuel Avenue and Best Rate, jointly and severally, for damages, plus costs, interest, and such other relief as this Court deems just and proper.

## COUNT VI – UNJUST ENRICHMENT
## (AGAINST MGC)

140.    AWL realleges paragraphs 1 through 74 above.

141.    Unbeknownst to AWL, and through the actions of D'Amico and others, AWL conferred a benefit upon MGC by way of MGC receiving revenues related to misdirected leads to a DID phone number assigned to MGC.

142.    MGC was enriched by receiving the revenues associated with these misdirected leads.

143.    MGC knew, or reasonably should have known, that it did not provide the leads for which it received substantial revenue that belonged to AWL.

144.    MGC's retention of the lead revenue is wrongful, and in violation of good conscience and fundamental principles of justice and equity.

145.    It would be inequitable for MGC accept and retain this benefit under circumstances without paying AWL for the reasonable value of the leads that generated the revenues MGC improperly obtained.

146.    AWL has no adequate remedy at law.

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

WHEREFORE, AWL demands judgment in its favor and MGC for damages, plus costs, interest, and such other relief as this Court deems just and proper.

## COUNT VII – CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

147.   AWL realleges paragraphs 1 through 74 above.

148.   This is an action for civil conspiracy by AWL against D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval.

149.   D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval conspired to aid Fuel Avenue and Best Rate to tortuously interfere with D'Amico and AWL's EPIA.

150.   D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval conspired to aid D'Amico in violating the restrictive covenants within the EPIA.

151.   D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval conspired to reroute leads meant for to AWL's customers via AWL's designated DIDs to DID's associated with Fuel Avenue, Best Rate, and MGC.

152.   D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval conspired to take payments for leads generated by AWL and for which they had no lawful right.

153.   D'Amico took overt acts in pursuance of the conspiracy, including *inter alia*:   (i) utilizing confidential and trade secret information he learned during his employment in a manner so as to enrich himself and others; (ii) utilizing his username and password for the Invoca® platform so as to misdirect leads to DIDs that would enrich himself and the other Defendants; (iii)

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

creating entities for the express purpose of competing against AWL during the intended period for non-competition; (iv) creating entities for the express purpose of stealing lead related revenues from AWL; and (v) misdirecting lead related revenues to persons and entities other than AWL.

154.    Denton took overt acts in pursuance of the conspiracy, including *inter alia*:  (i) utilizing confidential and trade secret information she learned during her employment in a manner so as to enrich herself and others; (ii) creating entities for the express purpose of competing against AWL during the intended period for non-competition; (iii) creating entities for the express purpose of stealing lead related revenues from AWL; (iv) operating entities from her personal residence that were created for the express purposes of stealing lead related revenues and competing against AWL; and, (v) aiding and encouraging D'Amico in violating his EPIA, to which Denton knew D'Amico was subject.

155.    Fuel Avenue took overt acts in pursuance of the conspiracy, including *inter alia*: (i) tortuously interfering with AWL's contracts D'Amico and Denton; (ii) receiving known misdirected lead related revenues from AWL's customers that belonged to AWL; (iii) sharing misdirected lead related revenues with other Defendant; and, (iv) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

156.    Best Rate took overt acts in pursuance of the conspiracy, including *inter alia*:  (i) tortuously interfering with AWL's contracts D'Amico and Denton; (ii) receiving known misdirected lead related revenues from AWL's customers that belonged to AWL; (iii) sharing misdirected lead related revenues with other Defendant; and, (iv) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

157.    Pena took overt acts in pursuance of the conspiracy, including *inter alia*:  (i) allowing his entities to be utilized in the conspiracy; (ii) knowingly receiving misdirected lead

ASSOULINE & BERLOWE, P.A.
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

generated revenues; (iii) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

158.    M. Silva took overt acts in pursuance of the conspiracy, including *inter alia*:   (i) allowing his entities to be utilized in the conspiracy; (ii) knowingly receiving misdirected lead generated revenues; (iii) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

159.    J. Silva took overt acts in pursuance of the conspiracy, including *inter alia*:   (i) coordinating within her employer, a customer of AWL, to create DIDs that could be utilized to misdirect lead related revenues that be longed to AWL; (ii) knowingly receiving misdirected lead generated revenues; (iii) plotting with Defendants to misdirect AWL's revenue for her own gain and for the other Defendants' gain; (iv) coordinating with M. Silva for his receiving personally and through his entities misdirected lead related revenues; and, (v) utilizing her employer's business and systems at her disposal to be used in Defendants' conspiracy.

160.    MGC took overt acts in pursuance of the conspiracy, including *inter alia*:   (i) tortuously interfering with AWL's contracts D'Amico and Denton; (ii) receiving known misdirected lead related revenues from AWL's customers that belonged to AWL; (iii) sharing misdirected lead related revenues with other Defendants; and, (iv) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

161.    Flovalue took overt acts in pursuance of the conspiracy, including *inter alia*:   (i) tortuously interfering with AWL's contracts D'Amico and Denton; (ii) receiving known misdirected lead related revenues from AWL's customers that belonged to AWL; (iii) sharing misdirected lead related revenues with other Defendants; and, (iv) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

162.     Flowval took overt acts in pursuance of the conspiracy, including *inter alia*:   (i) tortuously interfering with AWL's contracts D'Amico and Denton; (ii) receiving known misdirected lead related revenues from AWL's customers that belonged to AWL; (iii) sharing misdirected lead related revenues with other Defendants; and, (iv) plotting with Defendants to misdirect AWL's revenue for his own gain and for the other Defendants' gain.

163.     AWL has been damaged by D'Amico's acts in furtherance of the conspiracy.

164.     AWL has been damaged by Denton's acts in furtherance of the conspiracy.

165.     AWL has been damaged by Fuel Avenue's acts in furtherance of the conspiracy.

166.     AWL has been damaged by Best Rate's acts in furtherance of the conspiracy.

167.     AWL has been damaged by Pena's acts in furtherance of the conspiracy.

168.     AWL has been damaged by M. Silva's acts in furtherance of the conspiracy.

169.     AWL has been damaged by J. Silva's acts in furtherance of the conspiracy.

170.     AWL has been damaged by MGC's acts in furtherance of the conspiracy.

171.     AWL has been damaged by Flovalue's acts in furtherance of the conspiracy.

172.     AWL has been damaged by Flowval's acts in furtherance of the conspiracy.

173.     D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval damaged AWL by virtue of their combination and malicious motives to independently damage AWL, regardless of any underlying tort.

174.     The Defendants have acted in concert.   D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval are jointly and severally liable for the damages they have cause AWL.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

175.     Each of the Defendants conspired with each other to misappropriate AWL's trade secrets, intellectual property, confidential information, and marketing information and to use that property and information to unfairly compete and interfere with the AWL's business.

176.     Together, in furtherance of the Civil Conspiracy, the Defendants planned and used the misappropriated and converted property of AWL to interfere with AWL's sale of leads and reduce AWL's market share in the lead generation industry.

177.     Each of the Defendants acted together, in concert, willfully and maliciously.

178.     Each of the Defendants knew or should have known that their actions in furtherance of their conspiracy were in bad faith and malicious.

179.     All of the Defendants herein sought and have or stand to obtain a direct financial benefit from their collective unlawful actions against AWL.

180.     Each Defendant contributed to the acts complained herein.

181.     All conditions precedent to bring this action have occurred, been satisfied and, or waived.

**WHEREFORE**, AWL demands judgment in its favor and against D'Amico, Denton, Fuel Avenue, Best Rate, Pena, M. Silva, J. Silva, MGC, Flovalue, and Flowval, jointly and severally, for damages, plus costs, and interest, and such other relief as this Court deems just and proper.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

## **TRIAL BY JUDGE**

AWL demands a trial by Judge on all issues.

Dated: May 2, 2018                    Respectfully submitted,

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 100
Miami, FL 33133
Telephone: 305-567-5576
Facsimile: 305-567-9343

By:  /s/ Peter E. Berlowe
     Peter E. Berlowe, Esq. FBN: 143650
     peb@assoulineberlowe.com
     Andrea Bos, Esq. Florida Bar No. 0125359
     alb@assoulineberlowe.com

Attorneys for Plaintiff, All Web Leads, Inc.

**ASSOULINE & BERLOWE, P.A.**
3250 Mary St., Suite 100, Miami, Florida 33133 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343